# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
March 8, 2016 Session

## STATE OF TENNESSEE v. DINNIE MEREL ROBERTSON

**Appeal from the Circuit Court for Lawrence County**
**No. 31906     Stella L. Hargrove, Judge**

_____

**No. M2015-01137-CCA-R3-CD – Filed May 27, 2016**

_____

The Defendant, Dinnie Merel Robertson, was indicted for one count of attempted first degree murder, a Class A felony; one count of felony reckless endangerment, a Class E felony; three counts of aggravated cruelty to animals, a Class E felony; two counts of vandalism valued at $1,000 or more but less than $10,000, a Class D felony; and one count of carrying a firearm with the intent to go armed, a Class C misdemeanor. See Tenn. Code Ann. §§ 39-12-101, -13-103, -13-202, -14-105, -14-212, -14-408, -17-1307. Following a jury trial, the Defendant was convicted of one count of misdemeanor reckless endangerment, a Class A misdemeanor; three counts of cruelty to animals, a Class A misdemeanor; one count of vandalism valued at $1,000 or more but less than $10,000; one count of vandalism valued at more than $500 but less than $1,000, a Class E felony; and one count of carrying a firearm with the intent to go armed. See Tenn. Code Ann. §§ 39-13-103, -14-105, -14-202, -14-408. The jury acquitted the Defendant of the felony reckless endangerment charge. Following a sentencing hearing, the trial court imposed a total effective sentence of four years. On appeal, the Defendant contends (1) that the trial court erred by instructing the jury on cruelty to animals as a "lesser-included" offense of aggravated cruelty to animals; (2) that the trial court committed plain error by taking his motion for judgment of acquittal "under advisement"; and (3) that the evidence was insufficient to sustain his convictions for misdemeanor reckless endangerment and both of the vandalism charges. The State concedes that the indictments charging aggravated cruelty to animals failed to charge an offense; therefore, the trial court lacked the authority to instruct the jury on cruelty to animals. Following our review, we affirm the Defendant's convictions for misdemeanor reckless endangerment, both vandalism charges, and carrying a firearm with the intent to go armed. However, the Defendant's convictions for cruelty to animals are reversed and dismissed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court**
**Affirmed in Part; Reversed in Part; and Dismissed in Part**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and CAMILLE R. MCMULLEN, J., joined.

Claudia S. Jack, District Public Defender; Robert H. Stovall, Jr., Assistant District Public Defender (at trial); and Brandon E. White, Columbia, Tennessee (on appeal), for the appellant, Dinnie Merel Robertson.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Counsel; Brent A. Cooper, District Attorney General; Christi Leigh Thompson and Gary M. Howell, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

FACTUAL AND PROCEDURAL BACKGROUND

Travis Springer testified that on June 23, 2013, he received a phone call from his wife, who was a manager of a Mapco gas station in Lawrence County. Mr. Springer's wife complained that her truck was "making a squealing racket." Mr. Springer went to the gas station to check on his wife's truck and discovered that two of the truck's tires had been slashed. Mr. Springer changed the tires on his wife's truck and then went into the gas station to watch its security camera footage. Mr. Springer saw a gray Pontiac pull up beside his wife's truck on the security camera footage.

Mr. Springer testified that the car belonged to the Defendant, who was sitting in the passenger seat, and was being driven by the Defendant's girlfriend. The Defendant's girlfriend got out of the car and went into the gas station to purchase some beer. Mr. Springer also saw a man, whom he later identified as David Pruitt, get out of the backseat of the car and smoke a cigarette. When the Defendant's girlfriend returned to the car, Mr. Pruitt "went around to the left side [of Mr. Springer's wife's truck] away from the camera." Mr. Pruitt returned to the Defendant's car a few moments later, and "they drove off."

Mr. Springer testified that when he first watched the security camera footage, he did not know who the man in the backseat of the car was. Mr. Springer decided to go to the Defendant's house and confront him "about what was going on." Mr. Springer testified that he had known the Defendant since they were children. When he got to the Defendant's house that day, the Defendant offered Mr. Springer a beer. Mr. Springer declined and said that he wanted to know what "all the tire cuttings [were] about." Mr. Springer testified that the Defendant replied, "I got it in for your old lady."

Mr. Springer then asked the Defendant who was in the backseat of his car at the Mapco station. The Defendant denied that anyone had been in the backseat of his car and threatened to "whoop [Mr. Springer's] behind" for "accusing" him. Mr. Springer testified that he got out of his truck, and the Defendant began hitting him. According to Mr. Springer, the Defendant hit him until he was "down to [his] knees." Mr. Springer testified that he then unholstered his pistol and pistol-whipped the Defendant twice on the side of his head. With the Defendant on the ground, Mr. Springer got back into his truck and drove away.

Sometime between 3:30 and 4:00 p.m. the next day, Mr. Springer, as was his routine, went to his farm to feed his four horses. When he arrived, Mr. Springer found his neighbor, Edward Willis, tending to one of his horses. The horse, named Colty, "was just lifeless," had blood "dripping off [its] head," and "had shots all through [its] ears." Mr. Springer discovered that an older horse, named Tony, had been shot "right in [its] neck" and that another horse, named Blaze, had over 100 pellets shot into its side. Mr. Springer also discovered that his tractor "had been shot through the radiator and the left rear tire."

Mr. Springer testified that as he was tending to his horses, he received a phone call from his friend James Kenneth Wayne.[1] Mr. Springer estimated that this was between 4:30 and 5:30 p.m. While he was on the phone with Kenneth, Mr. Springer saw the Defendant's car go by. Mr. Springer testified that he saw the Defendant's girlfriend driving the car and the Defendant in the passenger seat. Mr. Springer further testified that he saw "a gun barrel sticking out the [passenger side] window" and that "the gun was pulled back in the vehicle" as it passed him.

Mr. Springer testified that Colty eventually lost its left eye and became very "jumpy." Tony never recovered from being shot in the neck, "lost a bunch of weight," and could no longer be ridden. Mr. Springer testified that he could still ride Blaze but that all of the shotgun pellets remained under its hide. Mr. Springer further testified that his tractor had a "busted" radiator and that he had to replace the radiator, the hood of the tractor, and a hose. Mr. Springer estimated that he spent $520 repairing his tractor and estimated that the bill from a veterinarian to examine the horses was $165.

Mr. Springer's neighbor, Mr. Willis, testified that on June 24, 2013, his girlfriend "heard some shots she thought were like firecrackers." This caused Mr. Willis to look out one of his windows, and he saw one of Mr. Springer's horses "outside the fence." Mr. Willis went to check on the horse and saw that its "face was all bloody." Mr. Willis

---

[1] Because James Kenneth Wayne and his son, Jamie Wayne, both testified at trial, we will refer to them as Kenneth and Jamie in order to avoid confusion. No disrespect is intended.

led the horse back to Mr. Springer's farm, tried to clean the horse, and "repaired the fence where nobody else would get out."

Mr. Willis recalled that when Mr. Springer showed up, they checked on the other horses. Mr. Willis testified that while they were checking on the other horses, he saw two people drive by with a shotgun barrel "sticking out the [car's] window." Mr. Willis further testified that he believed the car was "a medium blue Chevy" but that it "was hard to tell . . . the way they make cars anymore." Mr. Willis also testified that he did not know the Defendant and that he did not recall seeing the Defendant in the car that day.

Jamie Wayne testified that he had known the Defendant for a "[l]ong time." Jamie recalled that on the afternoon of June 23, 2013, the Defendant came by his house. Jamie explained that he did body work on cars and had a shop at his house. According to Jamie, the Defendant was driving a silver Pontiac and wanted to know if he "had seen Mr. Springer." Jamie told the Defendant that he had not seen Mr. Springer, and the Defendant responded that he was "looking for" Mr. Springer. Jamie recalled that the Defendant did not look "too good" and had "a cut on his forehead." Jamie further testified that the Defendant was acting "[k]ind of erratic."

The next day, June 24, 2013, Jamie saw the Defendant's Pontiac being driven down his street. Jamie recalled that the Defendant was in the passenger seat and that the driver "might have been [the Defendant's] girlfriend." After the car was driven away, Jamie heard a gunshot. Jamie testified that he did not recall seeing a gun in the car when it drove by and that the car was too far away for him to see if the gunshot came from the car. Jamie further testified that he was on the phone with his father, Kenneth, when he heard the gunshot.

Kenneth testified that he was a friend of Mr. Springer's and that he knew the Defendant because the Defendant "was an associate of [his] son." Kenneth recalled that on June 23, 2013, Mr. Springer "pulled up in [his] driveway," and they talked for a few minutes. Kenneth testified that Mr. Springer's truck was visible from the road, and he remembered seeing "a silver car" go by during their conversation.

The next day, June 24, 2013, Kenneth was working in his "out-shed" that afternoon when he "heard a shot." Kenneth "stepped outside" and saw the "backend of a silver car go out of sight." Kenneth thought that somebody had driven by and "just shot in the air or something." Kenneth got into his SUV, which was parked in his driveway, and "went out to the convenience store." On the way to the convenience store, Kenneth called Mr. Springer to tell him about the gunshot he heard, and Mr. Springer told Kenneth about his horses having been shot.

When Kenneth returned from the convenience store, he parked his SUV in front of his garage. Kenneth then went into the garage to put the beer he had just purchased into "a little refrigerator that [sat] right inside [his] garage." A few minutes after Kenneth got out of his SUV, he heard another gunshot. Kenneth testified that he looked out of his garage and saw "the back windows of [his SUV] just shatter, and . . . go up in the air." Kenneth further testified that he saw a silver Pontiac, which he identified as the Defendant's car, accelerating away from his house. Kenneth recalled that the driver's side of the Pontiac was "closest to [his] house." Kenneth called Jamie after the shooting to tell him about it, and Jamie said that he could see the car being driven away.

Kenneth admitted that he did not see the shooter, and he did not see who was inside the Defendant's car as it was being driven away from his house. Kenneth also stated that he did not believe the shooter intended to kill him because a large hedge obscured part of his garage and likely prevented the shooter from seeing him inside the garage. Kenneth testified that when he later trimmed the hedge he discovered shotgun pellets "all over the side of [his] house." Kenneth further testified that the shotgun blast to his SUV damaged the tailgate and the interior of the vehicle in addition to blowing out the rear windows. Kenneth received an estimate that repairing the damage would cost $3,600.

Sergeant Melinda Brewer of the Lawrence County Sheriff's Department testified that on June 24, 2013, she was dispatched to Mr. Springer's farm regarding the shooting of his horses. While in route to Mr. Springer's farm, Sgt. Brewer was informed that there had been a second "call of shots fired" and that the suspect vehicle was "coming toward where [she] was at." Sgt. Brewer and several other officers "staged up" to stop the vehicle. The officers stopped a silver Pontiac with two people inside. Sgt. Brewer testified that she approached the passenger side of the car and could "see the butt of a gun" leaning against the passenger side door. Sgt. Brewer reached into the car and removed the gun.

The Defendant was in the passenger seat of the car, and his girlfriend was in the driver's seat. Sgt. Brewer testified that the Defendant smelled of alcohol. Inside the car, Sgt. Brewer found "an opened container of beer," a box of shotgun shells, and loose shotgun shells in the car's console and the floorboard of the passenger seat. Sgt. Brewer testified that the box stated that it contained twenty-five shotgun shells, but there were only ten in the box when she confiscated it. Sgt. Brewer admitted that she did not find any spent shotgun shells inside the car and that the shotgun was unloaded when she removed it from the car. Sgt. Brewer testified that she believed that the shotgun was operational but that she never test fired it.

Sgt. Brewer recalled that when the Defendant was arrested, he was "ranting about the fact that [they had] got the wrong person," told them that he had been assaulted, and

was "trying to show [them] his injury." Officer Zach Newton of the Saint Joseph Police Department testified that he assisted in the Defendant's arrest. Officer Newton recalled that the Defendant had the shotgun "in [his] lap" when the car was stopped. Officer Newton further recalled that as he was transporting the Defendant to jail, the Defendant seemed "pretty upset" and said that the officers "would be working a murder when he got out, because he would kill them next time."

After Officer Newton testified, the trial court took a recess. When the trial court reconvened, with the jury out of the courtroom, the State informed the trial court that it would rest its case "when the jury [came] back," and defense counsel informed the trial court that the Defendant would not put on any proof. A hearing pursuant to Momon v. State, 18 S.W.3d 152 (Tenn. 1999), was then conducted, during which the Defendant waived his right to testify. At the conclusion of the Momon hearing, defense counsel moved to "dismiss several counts from [the] indictments."

During the discussion of the Defendant's motion, defense counsel brought to the trial court's attention the fact that the aggravated cruelty to animals statute did not apply to horses. The trial court and the parties discussed the issue for several minutes before the trial court decided to dismiss the jury for the day. The jury was sent home before either the State or the Defendant rested. The State eventually conceded the issue but argued that the trial court should charge the jury with cruelty to animals as a "lesser-included" offense. Defense counsel objected, and the trial court stated that it would take the issue "under advisement" and let the parties "know first thing in the morning." The Defendant made no objection to the trial court taking the issue "under advisement."

The Defendant also requested that the trial court charge the jury with vandalism valued at more than $500 but less than $1,000 with regards to Mr. Springer's tractor because the State failed to prove $1,000 or more of damage as charged in the indictment. The State conceded the issue, and the trial court agreed to amend the charge. Also during discussion on the Defendant's motion for judgment of acquittal, the Defendant requested that the trial court charge misdemeanor reckless endangerment as a lesser-include offense of attempted first degree murder. The Defendant then moved on to the charge of carrying a firearm with the intent to go armed. The trial court stated that it would research the issue and let the parties "know in the morning." Again, the Defendant made no objection. The trial court overruled the Defendant's motion for judgment of acquittal with respect to the other charges and adjourned for the day with no objection from the Defendant.

Prior to the jury's entering the courtroom the next morning, the trial court ruled that it would charge the jury with cruelty to animals rather than aggravated cruelty to animals as charged in the indictment and overruled the Defendant's motion for judgment of acquittal regarding the charge of carrying a firearm with the intent to go armed. The

jury was returned to the courtroom, and the State rested. The Defendant then immediately rested his case.

Based upon the foregoing proof, the jury convicted the Defendant of misdemeanor reckless endangerment and vandalism valued at $1,000 or more but less than $10,000 with respect to the shooting at Kenneth's house. The jury convicted the Defendant of three counts of cruelty to animals and one count of vandalism valued at more than $500 but less than $1,000 but acquitted the Defendant of the felony reckless endangerment charge regarding the shooting at Mr. Springer's farm. The jury also convicted the Defendant of carrying a firearm with the intent to go armed. Following a sentencing hearing, the trial court imposed a total effective sentence of four years. This timely appeal followed.

## ANALYSIS

### I. Cruelty to Animals Convictions

The Defendant contends that the trial court erred by instructing the jury on cruelty to animals as a "lesser-included" offense of aggravated cruelty to animals. The Defendant argues that cruelty to animals is not a lesser-included offense of aggravated cruelty to animals. The State concedes that the trial court erred by instructing the jury on the charges of cruelty to animals but argues the indictments charging aggravated cruelty to animals failed to charge an offense; therefore, the trial court lacked the authority to instruct the jury on cruelty to animals. We agree with the State.

The indictments charging the Defendant with aggravated cruelty to animals all alleged that the Defendant, "with aggravated cruelty and with no justifiable purpose, cause[d] serious physical injury to a companion animal, to wit: a horse belonging to Travis Wayne Springer, in violation of Tennessee Code Annotated [s]ection 39-14-212." Section 39-14-212 applies only to "companion animals," which subsection (b)(2) defines as "any non-livestock animal as defined in [Tennessee Code Annotated section] 39-14-201."

"Non-livestock animal" is defined as follows:

> [A] pet normally maintained in or near the household or households of its owner or owners, other domesticated animal, previously captured wildlife, an exotic animal, or any other pet, including but not limited to, pet rabbits, a pet chick, duck, or pot bellied pig that is not classified as "livestock" pursuant to this part . . . .

Tenn. Code Ann. § 39-14-201(3).

Conversely, "livestock" is defined as "all equine as well as animals which are being raised primarily for use as food or fiber for human utilization or consumption including, but not limited to, cattle, sheep, swine, goats, and poultry . . . ." Tenn. Code Ann. § 39-14-201(2) (emphasis added). More importantly, subsection (n) of the aggravated cruelty to animals statute provides that "[t]he provisions of this section do not apply to equine animals or to animals defined as livestock by the provisions of [section] 39-14-201." Tenn. Code Ann. § 39-14-212(n) (emphasis added). As such, the shooting of Mr. Springer's horses was not aggravated cruelty to animals as defined by the statute.

"A lawful accusation is an essential jurisdictional element without which there can be no prosecution." State v. Perkinson, 867 S.W.2d 1, 5 (Tenn. Crim. App. 1992) (citing State v. Hughes, 371 S.W.2d 445 (Tenn. 1963)). To allow a "[c]onviction upon a charge not made would be sheer denial of due process." De Jonge v. Oregon, 299 U.S. 353, 362 (1937). To that end, "[w]hen the indictment or presentment fails to fully state the crime, all subsequent proceedings are void." Perkinson, 867 S.W.2d at 5 (citing State v. Morgan, 598 S.W.2d 796, 797 (Tenn. Crim. App. 1979)). As such, the trial court lacked the authority to allow the continued prosecution of the Defendant on the void indictments by instructing the jury on the offense of cruelty to animals. Accordingly, the Defendant's convictions for cruelty to animals are reversed and dismissed.

*II. Motion for Judgment of Acquittal*

The Defendant contends that the trial court committed plain error by taking his motion for judgment of acquittal "under advisement." Citing State v. Mathis, 590 S.W.2d 449, 453 (Tenn. 1979), the Defendant argues that the trial court "should have ruled, then and there, as to whether the proof presented by the State was sufficient to convict him of [the] indicted charges" because his motion was made "at the conclusion of the State's proof." The State responds that Mathis "is not applicable to the facts presented here" and that the Defendant "has not shown any error in the trial court's procedure."

Tennessee Rule of Criminal Procedure 29 provides that a defendant may move for a judgment of acquittal "after the evidence on either side is closed." Tenn. R. Crim. P. 29(b). In Mathis, the trial court elected to take a motion for judgment of acquittal made at the close of the State's proof by a defendant "under advisement and [to] hear the entire case before making a final ruling." 590 S.W.2d at 453. Our supreme court responded by holding that "[t]here is no authority in our practice or procedure in a criminal case for the trial judge to take under advisement a motion for a judgment of acquittal made at the [c]onclusion of the State's proof." Id.

The Defendant made no objection to the trial court taking portions of his motion for judgment of acquittal "under advisement" and did not raise this issue in his motion for

new trial. As such, the Defendant has waived full appellate review of this issue. See Tenn. R. App. P. 3(e) (providing that "no issue presented for review shall be predicated upon error . . . committed or occurring during the trial of the case . . . unless the same was specifically stated in a motion for a new trial"); Tenn. R. App. P. 36(a) (providing that no relief will "be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error"). Therefore, we examine this issue solely to determine whether plain error review is warranted.

This court has repeatedly held that there is "no room for a plain error analysis" of whether a trial court has improperly taken a motion for judgment of acquittal made at the close of the State's proof under advisement. State v. Jimmy Lee Bonds, No. M2005-02546-CCA-R3-CD, 2006 WL 2773455, at *10 (Tenn. Crim. App. Sept. 28, 2006) (quoting State v. Frank E. Huey, No. M2000-02793-CCA-R3-CD, 2002 WL 517132, at *15 (Tenn. Crim. App. Apr. 5, 2002)). Furthermore, the Defendant's motion was actually made and ruled upon by the trial court before the State closed its proof and after both the State and defense counsel had stated that they intended to rest when the jury returned, which they both did immediately upon the return of the jury the next day. As such, the Defendant has failed to show that "a substantial right" of his was "adversely affected" by the trial court's actions. State v. Page, 184 S.W.3d 223, 230-31 (Tenn. 2006) (listing the five factors that must be established for plain error review to be appropriate). Accordingly, we conclude that plain error review of this issue is not warranted.

*III. Sufficiency of the Evidence*

The Defendant contends that the evidence was insufficient to sustain his convictions for misdemeanor reckless endangerment and both of the vandalism charges.[2] The Defendant's argument focuses solely on whether the State established his identity as the perpetrator of these offenses. Chiefly, the Defendant argues that "no one actually witnessed" him committing the offenses. The Defendant also argues that he could not be the perpetrator of the shooting at Kenneth's house because Kenneth testified that the driver's side of the Defendant's car was facing his house. The State responds that the evidence is sufficient to sustain his convictions.

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light

---

[2] The Defendant also challenges the sufficiency of the evidence regarding his convictions for cruelty to animals. Having reversed and dismissed those convictions, we will not address this issue. Additionally, the Defendant does not challenge the sufficiency of the evidence regarding his conviction for carrying a firearm with the intent to go armed.

most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence, rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. <u>See</u> <u>State v. Sheffield</u>, 676 S.W.2d 542, 547 (Tenn. 1984); <u>State v. Cabbage</u>, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. <u>See</u> <u>State v. Bland</u>, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." <u>Bland</u>, 958 S.W.2d at 659; <u>State v. Tuggle</u>, 639 S.W.2d 913, 914 (Tenn. 1982). A guilty verdict "may not be based solely upon conjecture, guess, speculation, or a mere possibility." <u>State v. Cooper</u>, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). However, "[t]here is no requirement that the State's proof be uncontroverted or perfect." <u>State v. Williams</u>, 657 S.W.2d 405, 410 (Tenn. 1983). Put another way, the State is not burdened with "an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." <u>Jackson</u>, 443 U.S. at 326.

The foregoing standard "applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." <u>State v. Pendergrass</u>, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Our supreme court has held that circumstantial evidence is as probative as direct evidence. <u>Dorantes</u>, 331 S.W.3d at 379-81. In doing so, the supreme court rejected the previous standard which "required the State to prove facts and circumstances so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." <u>Id.</u> at 380 (quoting <u>Crawford</u>, 470 S.W.2d at 612) (internal quotation marks omitted).

Instead, "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." <u>State v. Dorantes</u>, 331 S.W.3d 370, 381 (Tenn. 2011). The reason for this is because with both direct and circumstantial evidence, "a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference." <u>Id.</u> at 380 (quoting <u>Holland v. United States</u>, 348 U.S. 121, 140 (1954)). To that end, the duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." <u>State v. Sisk</u>, 343 S.W.3d 60, 67 (Tenn. 2011). Additionally, the identity of the perpetrator "is an essential element of any crime." <u>State v. Rice</u>, 184 S.W.3d 646,

662 (Tenn. 2006). However, the perpetrator's identity "may be established solely on the basis of circumstantial evidence." State v. Lewter, 313 S.W.3d 745, 748 (Tenn. 2010).

Here, there was overwhelming circumstantial evidence that the Defendant was the perpetrator of these offenses. Mr. Springer testified that these offenses occurred one day after he had an altercation with the Defendant. Mr. Springer also testified that he saw the Defendant and the Defendant's girlfriend drive by his farm with a gun barrel sticking out of the Defendant's car window shortly after the shooting of his horses and tractor. Jamie testified that he saw the Defendant's car pass his house shortly before hearing a gunshot. Kenneth testified that he had seen a silver car being driven away after hearing a gunshot and that, later, he saw the Defendant's car accelerating away from his house immediately after his SUV was shot at.

The Defendant was arrested nearby shortly after the shooting at Kenneth's house. When the Defendant was arrested he was drunk and had a shotgun "in [his] lap," an over half-empty box of shotgun shells in his car, and shotgun shells strewn about the console and passenger side of his car. The Defendant also stated to Officer Newton that the officers "would be working a murder when he got out, because he would kill them next time." With respect to the Defendant's argument that he could not have been the shooter at Kenneth's house because Kenneth testified that the driver's side of the Defendant's car was facing his house, the State's proof was not required to be perfect. The jury was free to accept or reject Kenneth's testimony about which side of the Defendant's car was facing his house, and we will not disturb the jury's determination on appeal. Accordingly, we conclude that the evidence was sufficient to sustain the Defendant's convictions for misdemeanor reckless endangerment and both of the vandalism charges.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgments of the trial court regarding the Defendant's convictions for misdemeanor reckless endangerment, vandalism valued at $1,000 or more but less than $10,000, vandalism valued at more than $500 but less than $1,000, and carrying a firearm with the intent to go armed are affirmed. However, as we have concluded that the indictment charging the Defendant with three counts of aggravated cruelty to animals failed to state an offense; the Defendant's convictions for cruelty to animals are reversed and dismissed.

_____
D. KELLY THOMAS, JR., JUDGE

-11-